UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JESSICA WASHINGTON,

    Plaintiff,

    v.

THURGOOD MARSHALL ACADEMY,

    Defendant.

Civil Action No. 03-2570 (CKK)

**MEMORANDUM OPINION**
(June 19, 2006)

Plaintiff, a special education teacher, brings the above-captioned action against her former employer, Defendant Thurgood Marshall Academy ("TMA"), alleging the public charter high school misrepresented her job duties and working hours to induce her to sign a one-year employment contract, then fired her for bringing school violations of the federal Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, to TMA's attention (or alternatively on account of her familial status or sex), in violation of contract provisions, District of Columbia tort law regarding wrongful discharge, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 1-2525 *et seq.  See* Compl. ¶¶ 38-45 (Count I – Breach of Contract), ¶¶ 46-52 (Count II – Misrepresentation), ¶¶ 53-62 (Count III – Wrongful Discharge), ¶¶ 63-72 (Count IV – Violations Under the DC Human Rights Law).

Following extensive discovery, Defendant filed a Motion for Summary Judgment, followed by Plaintiff's Opposition and Defendant's Reply.  Upon a searching examination of the filings before the Court, the attached exhibits, the relevant case law,

and the entire record herein, the Court shall deny-in-part and grant-in-part Defendant's

Motion for Summary Judgment with respect to Count I, and shall grant Defendant's

Motion for Summary Judgment with respect to Counts II, III, and IV.  As a result,

Plaintiff has one remaining triable claim:  her contention within Count I that she did not

resign employment at TMA, but rather was involuntarily terminated without cause in

violation of Paragraph Eight of her employment contract.

## I: BACKGROUND

A.      *Plaintiff's Job Search, Interview, and Contract*

Plaintiff Jessica Washington worked as a Special Education Coordinator from

2001 to 2002 for Friendship Edison Collegiate Academy.  Compl. ¶ 8.  In early summer

2002 Ms. Washington decided to seek alternate employment, citing a caseload of

approximately 100 special education students, long working hours, and the desire to

spend more time with her 7 year old daughter.  *See id*.  Her job search led her to a

Washington Post advertisement for a "Special Education Teacher" position at Thurgood

Marshall Academy ("TMA"), a public charter high school located within the District of

Columbia.  *See* Compl. ¶ 11; Pl.'s Opp'n, Ex. 10 (7/7/02 Washington Post

Advertisement).[1]  She also viewed an on-line posting for the position on the D.C. Public

Charter Board Link, and followed a link from that site to TMA's website, which also

listed the opening.  *See* Pl.'s Opp'n Ex. 1 (2/8/05 Washington Dep.) at 45:2-47:20.

---

[1] Plaintiff states she saw the advertisement in June, 2002, but only provided a copy of
TMA's July 7, 2002 Washington Post advertisement to the Court (which ran after
Plaintiff had already submitted her application).  *See* Pl.'s Opp'n Ex. 1 (2/8/05
Washington Dep.) at 45:2-46:1.  Although the July 7, 2002 advertisement copy is the
only one Plaintiff has supplied, this discrepancy is not contested, *see* Def.'s Mot. for
Summ. J. (discrepancy not mentioned in motion), and in any event does not factor into
this Court's decision; indeed, it appears as though the two advertisements were identical.

On July 1, 2002, in response to the advertisement, Washington submitted a résumé "to be considered for your Special Education position."  *See* Def.'s Mot. for Summ. J., Ex. 3 (7/1/02 Washington Cover Letter).  TMA Principal Joseph Feldman telephoned Washington after receiving her application.  Compl. ¶ 13; Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 45:7-22, 54:7-12.  In the ensuing 3-5 minute conversation, Washington answered general questions about special education, and inquired who would provide "related services" for the special education students.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 57:4-5, 58:1-8.  Principal Feldman told Washington that the school had contracted with another company, End-to-End Solutions ("ETES"), to provide related services, which include psychological counseling, occupational therapy, and speech and language therapy.  *Id*. at 58:1-60:15.  In a second 3-5 minute conversation at a later date, Washington arranged for a face-to-face interview with TMA.  *Id*. at 55:6-56:4.

In July 2002, Washington met with Principal Feldman and TMA Curriculum Coordinator Nicole Richardson for her face-to-face interview.  Compl. ¶ 14.  Washington learned she "would be expected to help TMA in setting up their special education program."  *Id*.  Ms. Washington inquired about the school's other special education staff, and learned that there were none.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 84:2-85:3.  Washington then asked how many special education students the school had, and was told six.  *Id*. at 85:10-13.  Principal Feldman and Ms. Richardson laughed about how much smaller this was from her previous caseload.  *Id*. at 85:14-16.  She was also informed that the workday would be from 8:15 a.m. until 4:00 p.m., *see* Compl. ¶ 14, but that she would be required to attend Monday staff meetings, and that

TMA students were required to participate in a tutorial program until 6:00 p.m. daily. Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 77:20-78:9.  Concerned about the implications of this tutorial program for her working hours, Washington inquired what time she could expect to leave work, and was told between 4:00 p.m. and 4:30 p.m.  *Id.* at 78:1-12, 195:7-9.  Finally, she learned from an article she read while waiting for her interview that the school had been in existence for only one year, had a class of only ninth graders in the previous, but would have ninth and tenth graders in the current class. *Id.* at 85:17-86:10.  The entire interview took no longer than 5 minutes.  *Id.* at 67:15-68:2.

Washington was subsequently offered employment and accepted, signing a written contract with TMA on August 1, 2002 (hereinafter, "the Employment Contract" or "the Contract").  Compl. ¶ 17; Def.'s Mot. for Summ. J., Statement of Facts Not Genuinely in Dispute ("Def.'s Statement of Facts") ¶ 1.  The Employment Contract stipulates:  "As a Special Education Teacher, you will be responsible for creating curriculum, assessing students, and modifying instruction in order to effectively address student academic needs, and any other appropriate responsibilities as a professional staff member of TMA." Compl., Ex. 1 (8/1/02 Employment Agreement) ¶ 2.  The Contract specifies a term of employment as commencing on August 1, 2002, and ending on July 31, 2003, *id.* ¶ 3, and provides for an annualized base salary of $40,000 with possible bonuses of $1500 per semester, contingent on performance reviews given by the Principal, *id.* ¶ 5.  Moreover, the Employment Contract provides for two allowable methods of termination — voluntary resignation and involuntary termination for cause — and lists detailed procedures for each possibility.  *Id.* ¶ 8.  A standard merger clause

states that the agreement "sets forth the entire understanding" of the parties and

"supersedes all prior agreements and communications," while further requiring that any

modification of the agreement be in writing.  *Id.* ¶ 15.

B.     *Plaintiff's Job Preparations, Teaching, and Complaints to Defendant
About Her Duties, Working Hours, and Bonus Evaluation*

After signing her employment agreement, Washington prepared for her job by

preparing a list of her job duties, applying for medical insurance coverage, and attending

teacher orientation week.  *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.)

at 227:9-228:17 (preparing a list of job duties), 113:21-114:13 (applying for medical

insurance coverage), 114:14-115:2 (attending teacher orientation week).

On August 2, 2002, Washington prepared a list of job duties and criteria she

proposed be used to conduct her bonus evaluation.  *See* Def.'s Mot. for Summ. J., Ex. 7

(8/2/02 "Special Education Responsibilities and Duties Evaluation Criteria Check List").

The duties included, *inter alia*:  "Be knowledgeable of, and comply with relevant state

and local regulations governing special education," provide updates on "legal

compliance," and "identify special education students."  *Id.*  The document also lists a

number of duties related to developing and administering TMA's special education

program in its twelve short paragraphs.  *Id.*  These duties include setting up and

maintaining records; beginning a student database; developing administrative procedures

for referral, assessment, placement, and Individual Education Program ("IEP")

development/review; creating a schedule for services; meeting with teachers to adapt

special education instruction; and determining the need for additional resources.  *Id.*

Washington sent this list to Principal Feldman on August 2, 2002.  *See id.*  Feldman

responded with a modified list, but the parties apparently never settled on one list to

serve as Washington's definitive bonus evaluation criteria.  Def.'s Mot. for Summ. J., Ex.

2 (2/8/05 Washington Dep.) at 228:3-229:13; Pl.'s Opp'n, Ex. 13 (undated "Expectations

of TMA Special Education Coordinator for SY 2002-2003 (draft)").  Washington

apparently recognized the wide scope of her duties when – on August 12, 2002 – she

completed an application for medical insurance coverage.  On the application, she listed

her occupation as "Special Education Coordinator."  *See* Def.'s Mot. for Summ. J., Ex. 5

(8/12/02 Insurance Application).

On or about either August 5 or 9, 2002, Washington attended Teacher Orientation

Week at TMA.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 114:14-

115:2.  During orientation, she learned of a number of support duties TMA expected of

its staff.  *Id.* at 114:14-116:8.  These duties included participating in the "critical friends"

teacher evaluation program, a "professional portfolio" program, acting as an adviser,

attending meetings on weeknights other than Mondays, and staying after school to ensure

that "tutored students attended and stayed for their tutoring sessions."  *Id.*; *see also id.* at

108:1-10; Compl. ¶ 24.  Washington learned she would have to "support the rituals and

expectations of the school, attend all the school celebrations, open houses and grading

conferences, be at school from 8:15 to 6:00," and – on a rotating schedule – complete

cafeteria duty and hallway duty.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington

Dep.) at 110:8-111:9.  Around this time Mr. Feldman added a one school-period social

studies class to Ms. Washington's roster of teaching duties.  *Id.* at 109:10-16.

In late August, 2002, Washington finally began teaching at TMA.  Initially her

"class size and teaching duties were sufficient" and corresponded to expectations she had

developed in her phone conversations and interview.  Compl. ¶ 20.  For instance,

immediately after Washington was hired she was assigned a special education class of approximately six children. *Id.* According to Plaintiff, however, her duties soon increased beyond what she had anticipated for her position. *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 114:14-116:8. After a review of student files, Washington discovered 15 to 18 special education students with records. *Id.* at 136:16-137:18. She went to previous schools and contacted parents, and located those students' records for TMA. *Id.* Washington "met with TMA officials a number of times concerning the new duties and expanded duties." Compl. ¶ 25; *see also* Def.'s Mot. for Summ. J. (2/8/05 Washington Dep.) at 134:16-135:5. At these meetings she also "discussed with TMA that it was not complying with the requirements under IDEA." Compl. ¶ 25; *see also* Def.'s Mot. for Summ. J. (2/8/05 Washington Dep.) at 172:9-173:3.

After one such conversation, Principal Feldman responded in writing on September 26, 2002. *See* Def.'s Mot. for Summ. J., Ex. 9 (9/26/02 E-mail from Joseph Feldman to Jessica Washington). Feldman emphasized that "the non-special education responsibilities (gym, attendance, advisory, detention, Saturday) are pretty much what we all do around here." *Id.* Moreover, Feldman arranged for Washington to no longer have to teach her social studies class as of October 7, 2002. *Id.* Finally, he urged Washington to interact more closely with ETES, explaining that ETES employees Nancy and Brenda "were resources to help us" and that "they have been hired to make sure we are in compliance" with IDEA and other disabilities laws. *Id.*

On November 1, 2002, Washington had a discussion with TMA Executive Joshua Kern about IDEA compliance. *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington

Dep.) at 172:21-173:22. She "informed him that the students were suffering, that the

school was in noncompliance, and that [she] had identified several additional students[.]"

*Id*. During this meeting, Washington also raised – for the first time – the issue of the

alleged inadequacy of her salary. *Id*. at 189:3-17. She "informed Feldman and Kern that

she had been contacted by another school about a possible position and to let her know

whether or not TMA would increase her salary." Compl. ¶ 29; *see also* Def.'s Mot. for

Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 189:6-8, 198:14-15. The firmness and

exact nature of this "demand" are disputed, *see* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05

Washington Dep.) at 195:16-198:15, but in any case it precipitated the eventual

termination of Washington's employment at TMA, as later events will show.

Indeed, all was not rosy for Ms. Washington at TMA throughout the remainder of

2002. On November 18, 2002, she received a less-than-encouraging memorandum from

Principal Feldman summarizing a conversation about her informal evaluation of

November 5, 2002. *See* Pl.'s Opp'n, Ex. 23 (11/18/02 Mem. from Joseph Feldman to

Jessica Washington re: Informal Evaluation). The November 18, 2002 memorandum

stated that "if [thusfar] were the semester you would not receive any bonus." *Id*.

However, Feldman expressed his "hope that this conversation and memo will clarify my

expectations and that you can be successful by the time of the semester's formal

evaluation." *Id*. The memo indicated several positive performance areas, as well as

several areas in need of improvement, including timeliness in responding to requests for

information, attentiveness to advisory duties, working closely with ETES, and adhering

to schedule. *Id*. Washington expressed dissatisfaction with this review, complaining in

an e-mail the same day that "My bonus [should be] primarily based on what we agreed to

and not things added arbitrarily at your whim.  I am being paid at a significantly lower

annual salary than previous years . . . ."  *See* Def.'s Mot. for Summ. J., Ex. 8 (10/18/02 E-

mail from Jessica Washington to Joseph Feldman).  On November 22, 2002, Kern

advised Washington that he needed more time to look into the issues they had discussed

in the previous weeks.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at

210:20-211:12.  Washington "just continued" doing her job for several weeks, until she

again asked Kern on December 20, 2002, just before the school's winter break, if he "had

come up with anything" regarding the issues they had discussed.  *See id.* at 244:19-

247:11.  In response, Kern asked Washington to meet him at a Starbucks at 7:00 p.m that

evening.  *See id.* at 244:19-248:5; Compl. ¶ 31.

     *C.*     *Termination of Plaintiff's Employment*

     Kern opened the December 20, 2002 meeting with Washington at Starbucks by

stating "I think it's in the best interest that Thurgood Marshall is asking you to resign."

Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 249:20-250:1.  According

to Plaintiff, she did not affirmatively respond to Kern's statement – that is, she never

specifically refused to resign during this exchange, but "never said, 'Yeah, okay,' either."

*Id.* at 258:1-5.  Following his request that she resign, Plaintiff remembers that Kern

continued, "I don't think it's in the best interest of TMA at this time to increase your

salary at this time [sic], because our budget is set at the beginning of the year, and we're

not in the position to increase your salary."  *Id.* at 250:4-8.  Elaborating, he stated that at

first he believed Washington had demanded more money after a bad day, but after

several repetitions he realized she was serious.  *See id.* at 252:5-253:12.  "The money is

not there to change your salary or your duties," Kern apparently concluded.  *Id.* at

253:19-21.  "In shock," Washington asked when would be her last day.  *Id*. at 252:1-4,

255:2-3.  Kern replied that"[t]oday," would be her final day with TMA, as the school

already had found a replacement for her position.  *Id*. at 255:4-8.  Her last check would

be January 3, 2003.  *Id*.  Kern and Washington arranged to meet the next day at the

school so she could collect her personal belongings.  *Id*. at 257:12-22.

 The next day, December 21, 2002, Washington sent a short follow-up e-mail to

Kern.  *See* Def.'s Mot. for Summ. J., Ex. 11 (12/21/02 E-mail from Jessica Washington

to Joshua Kern).  According to the e-mail, Kern "asked for my resignation . . . due to

[his] refusal to provide the salary increase I requested."  *See id*.  Washington wrote that,

"However, I am offering my 90 day resignation as stipulated in our employment contract

only if my salary is paid for the duration of the 90 day period."  *Id*.  In reply, Kern wrote

that he had "asked for [her] resignation effective immediately based on two previous

conversations we had over the last month in which you presented me an ultimatum of

paying you more and / or reducing your responsibilities or you would accept another

position that you were being offered."  Def.'s Mot. for Summ. J., Ex. 12 (12/21/02 E-

mail from Joshua Kern to Jessica Washington).  Kern believed Washington had "agreed

to resign effective immediately" the previous night.  *See id*.  Alternatively, Kern viewed

Washington's follow-up e-mail as giving her 90 day notice under the terms of the

contract.  *See id*.  In either case, Washington was "no longer employed at TMA."  *Id*.

 The foregoing events led to Washington filing a Complaint with this Court on

December 18, 2003, wherein Washington claims that: TMA misrepresented her job

duties and working hours to induce her to sign a one-year employment contract, then

fired her for bringing school violations of the federal Individuals with Disabilities in

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., to its attention (or alternatively on account of her familial status or sex). *See* Compl. ¶¶ 38-45 (Count I – Breach of Contract), ¶¶ 46-52 (Count II – Misrepresentation), ¶¶ 53-62 (Count III – Wrongful Discharge), ¶¶ 63-72 (Count IV – Violations Under the DC Human Rights Law).

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the

issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

The Court shall consider resolution of Counts I through IV of Plaintiff's Complaint under District of Columbia law in turn, first looking at Plaintiff's (1) breach of contract claim, and then turning to her (2) misrepresentation, (3) wrongful discharge, and (4) DCHRA claims. Upon conclusion of this analysis, the Court shall turn its examination to two other topics broached, but not focused upon, by Plaintiff: (1) her intentional infliction of emotional distress "claim," and (2) her allegation – first raised in

her Opposition – that she was impermissibly terminated by TMA as a result of gender-based discrimination.

A.    *Plaintiff's Breach of Contract Claim*

To establish a breach of contract claim, a plaintiff must show "an unjustified failure to perform all or any part of what is promised in a contract." *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C. 1970) (citations omitted).  Washington alleges TMA violated her August 1, 2002 Employment Contract in two ways.  First, Plaintiff alleges TMA Director Joshua Kern terminated her without cause at their December 20, 2002 meeting at Starbucks, violating the agreed-upon term of employment and procedures for termination provided for in Paragraphs Three and Eight of the Contract.  *See* Compl. ¶¶ 31-36, 42, 43 & Ex. 1 (8/1/02 Employment Agreement) ¶¶ 3, 8.  Second, Plaintiff alleges Defendant unilaterally modified her job duties, thereby violating Paragraphs Two, Four, and Fifteen of the Contract.  *See* Compl. ¶¶ 21-28, 43 & Ex. 1 (8/1/02 Employment Agreement) ¶¶ 2, 4, 15.  For the reasons that follow, Defendant's Motion for Summary Judgment is denied with respect to the first allegation, and is granted with respect to the second.

1.    Plaintiff's allegation of termination without cause

Plaintiff alleges TMA Director Joshua Kern terminated her without cause at their December 20, 2002 meeting at Starbucks, in violation of the contractual term of employment and procedures for termination set out in her Employment Contract with TMA.  *See* Compl. ¶¶ 31-36, 42, 43 & Ex. 1 (8/1/02 Employment Agreement) ¶¶ 3, 8. By the terms of the August 1, 2002 Employment Contract, termination of Plaintiff's employment could proceed in two ways: Plaintiff could voluntarily resign, or TMA could

terminate her involuntarily for cause. *See* Compl., Ex. 1 (8/1/02 Employment Agreement) ¶ 8(a) ("Voluntary Termination By You – You may terminate your employment under this Agreement for any reason at any time by giving the Principal written notice of intent to terminate . . . ."), 8(b) ("Involuntary Termination For Cause – (1) Nothing in this agreement [sic] prevents TMA from terminating you immediately and without notice for cause . . . .").

Before voluntarily resigning, the Employment Contract required that Plaintiff provide TMA with 90 days notice, which TMA could waive by providing one week's written notice. *Id*. ¶ 8(a) (". . . by giving the Principal written notice of intent to terminate, delivered at least 90 days before the effective date of such . . . . The termination shall automatically become effective upon the expiration of the notice period, or earlier at the discretion of the Principal, provided, however, that the Principal will provide you with written notice of [sic] least one week before such an earlier termination."). In contrast, TMA could also terminate Plaintiff's employment "for Cause," which is defined by the Employment Contract as unsatisfactory performance of duties or serious misconduct. Compl., Ex. 1 (8/1/02 Employment Agreement) ¶ 8(b)(2)). Pursuant to the Employment Contract, Plaintiff – prior to any termination for "unsatisfactory performance" – was to be provided with a "fifteen (15) day period" to improve her "performance to a satisfactory level." *Id*. ¶ 8(b)(3). However, "[f]or acts of serious misconduct," TMA could terminate Plaintiff's employment "immediately and without notice." *Id*. ¶ 8(b)(4). If Plaintiff was terminated "for Cause," TMA was required to provide Plaintiff "with a written statement of the grounds for such termination within 10 business days after the date of termination." *Id*. ¶ 8(b)(5).

The parties dispute whether the facts of the December 20, 2002 meeting show that Plaintiff resigned or was terminated without cause.  According to Plaintiff, she never proactively offered to resign, but – when confronted with Kern's request that she resign – also never specifically refused to resign; rather, in shock from the request, she "didn't know how to respond or what to say."  *Id*. at 258:1-15.  Instead, Plaintiff emphasizes that the plain meaning of her subsequent written offer in her December 21, 2002 e-mail to Kern suggests that she did not consent his resign request <u>unless</u> TMA accepted her counteroffer, which was contingent on TMA's promise to pay her for an additional 90 days.  *See* Def.'s Mot. for Summ. J., Ex. 11 (12/21/02 E-mail from Jessica Washington to Joshua Kern) ("According to our conversation yesterday evening, . . . you asked for my resignation . . . . I am offering my 90 day resignation as stipulated in our employment contract only if my salary is paid for the duration of the 90 day period.").

Defendant, however, claims that Plaintiff affirmatively agreed at the Starbucks meeting "to resign effective immediately," Def.'s Mot. for Summ. J., Ex. 12 (12/21/02 E-mail from Joshua Kern to Jessica Washington) ("It is my understanding that last night you agreed to resign effective immediately . . . ."), and interprets her subsequent written offer of "90 day resignation . . . only if my salary is paid for the duration of the 90 day period" as notice to resign, with a separate demand for pay under an erroneous interpretation of her Employment Contract.  *See* Def's Mot. for Summ. J. at 22 (explaining why the 90-day provision was to protect TMA, meaning that the resigning teacher had to provide the school with 90 days notice before resigning, not that TMA had to pay the teacher for 90 days salary following the effective resignation date).

If Plaintiff's view is accepted (i.e., that she refused to resign absent an agreement

that she be paid by TMA for an additional 90 days), a reasonable fact-finder could

conclude that Defendant terminated Plaintiff without sufficient cause, and also breached

the notice, "improved performance," and written statement provisions within Paragraph

Eight of the employment contract.[2]  If Defendant's contention is accepted, on the other

hand, a reasonable fact-finder could conclude that Plaintiff voluntarily resigned; as such,

TMA followed the contract's voluntary termination procedure, and did not breach the

Employment Contract.  Resolution of this disputed factual issue can thus sway the

outcome of this case, and is therefore material.  Given the conflicting evidence before the

Court on this material issue (in part, an inherent "he said, she said" situation dependent

upon a credibility determination), Plaintiff's allegation of termination without cause in

violation of Paragraph Eight of her Employment Contract cannot be dismissed on a

motion for summary judgment.  As such, to the extent that Defendant's motion seeks

summary judgment as to Plaintiff's breach of contract/ termination without cause claim,

Defendant's motion is denied.

2.    Plaintiff's allegation of unilateral modification of job duties

Plaintiff also alleges Defendant unilaterally modified her job duties, in violation

of Paragraphs Two, Four, and Fifteen of the Employment Contract.  *See* Compl. ¶¶ 21-

28, 43 & Ex. 1 (8/1/02 Employment Agreement) ¶¶ 2, 4, 15.

To establish a claim for breach of contract based on modification of job duties,

Plaintiff must show that her actual duties differed from the duties agreed upon between

_____

[2] Indeed, TMA never attempts to justify its actions vis-á-vis Plaintiff as a "for Cause"
termination.  Rather, TMA consistently maintains that Plaintiff resigned.  *See* Def.'s Mot.
for Summ. J. at 23 ("reasonable minds cannot find that TMA terminated Washington's
employment; instead, reasonable minds could not dispute that Washington resigned").

the parties and set forth in her Employment Contract. Under District of Columbia law, a completely integrated written agreement "supersedes all other understandings with respect to the subject matter of the agreement, whether consistent or inconsistent . . . ." *See Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61, 68 (D.D.C. 2005) (quoting *Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1996)). Given that the employment contract between Washington was completely integrated, Plaintiff cannot rely on her telephone conversations and interview dialogue to support a breach of contract claim. *See* Compl. ¶ 23.

Importantly, upon a review of the relevant documents, it is clear that the description of "Duties and Responsibilities" in the Employment Contract is flexible and open-ended. The Contract states: "As a Special Education Teacher, you will be responsible for creating curriculum, assessing students, and modifying instruction in order to effectively address student academic needs, and any other appropriate responsibilities as a professional staff member of TMA." Compl., Ex. 1 (8/1/02 Employment Agreement) ¶ 2. The Contract further provides that "[Washington] will be responsible for working in coordination and concert with the rest of the staff of TMA to provide a coherent, meaningful, and effective educational program for the school community. You will report to the Principal of TMA." *Id*. ¶ 4. To make out her breach of contract/unilateral modification of duties claim, Plaintiff must therefore adduce evidence showing her actual job duties went beyond "creating curriculum[,] working in coordination and concert with the rest of the staff[,] and any other appropriate responsibilities." Upon an examination of the arguments presented and the evidence adduced, it is clear that Plaintiff has not done so.

It is clear that the "unilaterally modified" responsibilities complained about by Plaintiff – i.e., her participation in "critical friends," hall duty, cafeteria duty, mentoring, and teaching social studies classes – fall under the Contract provisions requiring that Plaintiff fulfill "other appropriate responsibilities" and "work[] in coordination and concert with the rest of the staff."  Moreover, the contractual provision that enjoins Plaintiff from participating in hall duty is simply nonexistent.  Indeed, in signing her Contract, Plaintiff formally agreed to complete any appropriate duties assigned to her by the Principal.  *See* Compl., Ex. 1 (8/1/02 Employment Agreement) ¶ 2.  She knew the details of her duties had not been specified, and she accepted the Contract on that basis.  *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 228:3-229:13; Pl.'s Opp'n, Ex. 13 (undated "Expectations of TMA Special Education Coordinator for SY 2002-2003 (draft)").

Accordingly, a reasonable fact-finder could not conclude based on the proffered evidence that Defendant TMA breached its contract with Plaintiff Washington by unilaterally modifying her job duties and responsibilities.  To the extent that Defendant's motion seeks summary judgment as to Plaintiff's breach of contract/unilateral modification of duties claim, Defendant's motion is granted.

Although Plaintiff's breach of contract claim based on modification of her duties fails, her related misrepresentation claim does not necessarily expire.  Unlike a breach of contract claim, a misrepresentation claim need not show Defendant modified duties listed in the contract; it need only show Defendant made false representations about job duties prior to contracting.  Whether Plaintiff's misrepresentation claim survives summary judgment is examined in the next section.

B.     *Plaintiff's Misrepresentation Claim*

To establish a claim for fraudulent misrepresentation in the District of Columbia, a plaintiff must prove (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) action taken in reliance upon the representation, (6) which resulted in provable damages. *Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 839 (D.C. 1983) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977)). Fraud must be established by clear and convincing evidence "that is not equally consistent with honesty or deceit." *Bennett*, 377 A.2d at 69. Reliance must be reasonable or justifiable. *See Ehlen v. Lewis*, 984 F. Supp. 5, 9 (D.D.C. 1997); *Redmond v. Birkel*, 933 F. Supp. 1, 3 (D.D.C. 1996); *Raynor v. Richardson-Merrell, Inc.*, 643 F. Supp. 238, 243 (D.D.C. 1986). Similarly, a misrepresentation is material only "if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *See Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871 A.2d 480, 493 (D.C. 2005) (quoting Restatement (Second) of Contracts § 162(2)); *see also* Restatement (Second) of Contracts § 162, Comment (a) (misrepresentation "must not only be consciously false but also must be intended to mislead another"). Failure to prove any one element of fraud causes a fraud claim to fail. *Higgs v. Higgs*, 472 A.2d 875, 876 (D.C. 1984).

In this case, Plaintiff contends that TMA misrepresented her job duties, working hours, and number of students; that she relied on these representations; and that, as a result, she entered into an employment contract with Defendant to her detriment. *See* Compl. ¶¶ 23, 24, 27, 46-52. Plaintiff has, however, failed to provide clear and convincing evidence from which a reasonable fact-finder could conclude Defendant

fraudulently misrepresented either her job duties, working hours, or number of students.

The allegation that Plaintiff signed her employment contract with the impression she

would have minimal teaching duties, only six students, and get off work by 4:00 p.m. is

simply insufficient to prove a claim of misrepresentation in light of the uncontested

evidence in the record.

        1.     Job Duties

    Washington alleges TMA "misled [her] about the duties she was expected to

perform."  Compl. ¶ 48.  Those duties included the aforementioned participation in the

"critical friends" program, hall duty, cafeteria duty, mentoring, the social studies class,

special education coordination and administration duties, and staying after hours for

tutoring and meetings.  *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at

108:1-116:8; Compl. ¶¶ 24, 48.  However, "[c]onclusory allegations that a defendant's

actions were fraudulent and deceptive are not sufficient to satisfy [F.R.C.P.] 9(b)."

*Shekoyan v. Sibley Int'l Corp.*, 217 F.Supp.2d 59, 73 (D.D.C. 2002).  Even if properly

plead, Washington's claim of misrepresentation of job duties fails for another reason:

Plaintiff fails to provide clear and convincing evidence in support of four of its six

requisite elements.

    First, the evidence fails to reveal a false representation with respect to her job

duties.  Washington admits in her Complaint that she was told she "would be expected to

help TMA in setting up their special education program."  *Id.*  Her own list of job duties,

which she prepared the day after her interview, shows she expected to perform a number

of duties related to developing and administering TMA's special education program.  *See*

Def.'s Mot. for Summ. J., Ex. 7 (8/2/02 "Special Education Responsibilities and Duties

Evaluation Criteria Check List"). These duties include setting up and maintaining records, beginning a student database, developing administrative procedures for referral, assessment, placement, and Individual Education Program ("IEP") development/review, creating a schedule for services, meeting with teachers to adapt special education instruction, and determining the need for additional resources. *Id.* Futhermore, Washington does not allege TMA made any representations prior to her orientation concerning its "critical friends" program, hall duty, cafeteria duty, or other non-special education duties she did not anticipate performing. *See* Def.'s Mot. for Summ. J. (2/8/05 Washington Dep.) at 67:15-86:10, 108:1-116:8. The evidence, therefore, shows that (1) Washington was in fact told she would be expected to help develop TMA's special education program; (2) Washington fully expected to held administer and develop the program; and (3) TMA made no representations at all concerning Washington's "additional" non-special education job duties prior to her orientation. In light of this evidence, Plaintiff's conclusory assertion that TMA "misled her about the duties she was expected to perform," Compl. ¶ 48, together with evidence that TMA advertised for a special education "teacher" and not a special education "coordinator," *see* Pl.'s Opp'n, Ex. 10 (7/7/02 Washington Post Advertisement), is insufficient to prove with clear and convincing evidence that TMA made a false statement regarding Plaintiff's job duties.

Second, Plaintiff cannot demonstrate her reliance on TMA's alleged misleading statements was reasonable. Plaintiff seeks to rely on informal comments made during a five minute interview in preference to the contrary text of a written contract. Reliance on informal statements inconsistent with a written agreement is generally not reasonable under D.C. law. *See In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 105

(D.D.C. 2003) (noting that "District of Columbia courts have ruled that no reasonable

trier of fact could conclude that a plaintiff reasonably relied on oral representations

contradicted by express written provisions"); *Morauer & Hartzell, Inc. v. Local Union*

*No. 77, Int'l Union of Operating Eng'rs, AFL-CIO*, No. 1275-73, 1974 WL 1201 (D.D.C.

Nov. 27, 1974) (finding reliance on an alleged promise made with almost a complete lack

of formality unreasonable); s*ee also AES Corp. v. The Dow Chem. Co.*, 325 F.3d 174,

179 (3d Cir. 2003) (reasonable reliance to be determined on a case-by-case basis based

on all of the surrounding circumstances).   The list of job "Duties and Responsibilities" in

Washington's Employment Contract is flexible and open-ended.   Indeed, the Contract

explicitly states:   "As a Special Education Teacher, you will be responsible for creating

curriculum, assessing students, and modifying instruction in order to effectively address

student academic needs, and any other appropriate responsibilities as a professional staff

member of TMA."   Compl., Ex. 1 (8/1/02 Employment Agreement) ¶ 2.   In signing her

Contract, Plaintiff formally agreed to complete any appropriate duties assigned to her by

the Principal.   *Id.*   She knew the details of her duties had not been specified, and she

accepted the Contract on that basis.   *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05

Washington Dep.) at 228:3-229:13; Pl.'s Opp'n, Ex. 13 (undated "Expectations of TMA

Special Education Coordinator for SY 2002-2003 (draft)").   As Plaintiff knew the broad

scope of agreed-upon duties, it would be unreasonable to conclude that in entering the

Contract she reasonably relied to her detriment solely on Defendant's lack of detailed,

specific information, and her own private expectations about what her work would entail.

To hold otherwise would be to essentially outlaw all contracts of the form at issue in this

case.

Third and fourth, no evidence in the record, circumstantial or otherwise, indicates that Principal Feldman or Ms. Richardson made their alleged misrepresentations with knowledge of falsity or intent to deceive.  The evidence bespeaks to the contrary, and reflects a conscientious effort by TMA to apprise Washington of the nature of their school, their ambitions to go the extra mile to provide students with a superior education, and her expected role in the enterprise.  *See* Def.'s Mot. for Summ. J. (2/8/05 Washington Dep.) at 85:17-86:10.

2. <u>Working Hours</u>

Accepting Plaintiff's description of what transpired at the interview, TMA asserted that "the workday would be from 8:15am until 4:00pm."  Compl. ¶ 14.  This statement, in light of subsequent events during Plaintiff's tenure at TMA, is insufficient to constitute fraudulent misrepresentation for three reasons.  First, it is consistent with an honest statement about the length of TMA's school day.  Plaintiff's evidence shows that "Washington at her TMA orientation received a documentation [sic] that showed that the school day was 8:00 p.m. [sic] to 4:25 p.m. . . ."  Pl.'s Opp'n at 20.  Second, Plaintiff's evidence fails to provide any basis from which a reasonable fact-finder could conclude TMA made the assertion with knowledge of its falsity or intent to deceive.  All indications bespeak, to the contrary, at most a simple misunderstanding about her question:  TMA thought Washington asked about school hours.  Third, the foregoing discussion of the reasonableness of Plaintiff's reliance applies equally to working hours.  Plaintiff has not provided clear and convincing evidence from which a reasonable fact-finder could conclude TMA misrepresented her working hours.

3.    <u>Number of Students</u>

Washington claims "TMA officials. . .told [her] she would be teaching only 6 special education students."  Importantly, Washington's initial class size was 6 students. Compl. ¶ 20.  This shows the statement was not false, nor made with knowledge of falsity or intent to deceive.  Indeed, initially "[t]he class size and teaching duties were sufficient for Washington and it allowed her to provide transportation and more spend [sic] time with her school age daughter." *Id*.  Though Washington later discovered 15 to 18 special education students in the school, her job duties actually included *identifying* special education students, and she knew she would be the only special education teacher at the school.  Def.'s Mot. for Summ. J., Ex. 7 (8/2/02 "Special Education Responsibilities and Duties Evaluation Criteria Check List"); Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 84:2-85:3.  As such, she knew, or should have known, that her class size could increase during the year.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 136:16-137:18.

As with her claims of misrepresentation of job duties and working hours, Plaintiff has failed to produce clear and convincing evidence from which a reasonable fact-finder could conclude TMA misrepresented her class size.  As concluded in an earlier dismissal of fraud claims in this District, "[v]iewing the evidence in the record on the issue of fraud through the 'prism' of the clear-and-convincing evidentiary standard, it is apparent that there are no genuine issues of material fact, and that [Defendant] is entitled to a judgment as a matter of law." *Raynor*, 643 F.Supp. at 245.

C.     *Plaintiff's Wrongful Discharge Claim*

"Wrongful discharge" in the District of Columbia has three distinct usages.  In

one, wrongful discharge is identical to breach of contract; discharge is wrongful if it

violates contractual provisions.  *See Nickens v. Labor Agency of Metro. Wash.*, 600 A.2d

813, 817 (D.C. 1991).  In another, discharge is wrongful because it violates a statute.  *See*

*Freas v. Archer Servs.*, 716 A.2d 998, 1000-01 (D.C. 1998); *Thigpen v. Greenpeace, Inc.*,

Civ. A. No. 93-7587, 1993 WL 762109 (D.C. Super. Sept. 14, 1993).  Finally, wrongful

discharge may refer to the fact that an "employer engages in tortious conduct when it

fires an at-will employee for that employee's refusal to break the law at the employer's

direction."  *See Adams v. George W. Cochran & Co., Inc.*, 597 A.2d 28, 30 (D.C. 1991);

s*ee also Freas*, 716 A.2d at 1000.  This tort, created to serve public policy, has been

extended (with restrictive conditions) to protect "whistleblowers" from adverse personnel

actions.  *See Carl v. Children's Hosp.*, 702 A.2d 159, 159-61 (D.C. 1997) (*en banc*); *see*

*also Riggs v. Home Builders Inst.*, 203 F.Supp.2d 1, 6-11 (D.D.C. 2002) (discussing

*Carl*).

While not clearly delineated, Plaintiff seems to claim all three forms of wrongful

discharge.  Her Complaint alleges a "breach of the parties [sic] contract" under Count III,

"Wrongful Discharge."  Compl. ¶ 59.  To the extent Plaintiff's wrongful discharge claim

merely restates her breach of contract claims, those claims were resolved above.  *See*

*supra* Section III(A)(2).  Count IV, however, alleges statutory violations of the D.C.

Human Rights Act, claiming *inter alia* that TMA "did not want [Plaintiff] to comply with

the IDEA law."  *See* Compl. ¶ 69.  Plaintiff's Opposition to Defendant's Motion for

Summary Judgment picks up more of this latter theme, arguing that "Washington's

claims and actions fall squarely under the public policy exception and the whistleblowers

act." Pl.'s Opp'n at 38. This claim is defective; as discussed below, *see infra* Section

III(D), this allegation suffers from the same defect as Plaintiff's DCHRA claim in Count

IV: neither is supported by sufficient evidence from which a reasonable fact-finder could

find a causal connection between Plaintiff's complaints of "TMA's noncompliance with

the provisions under the federal IDEA law" and her alleged termination. Compl. ¶ 68.

    D.    *Plaintiff's DCHRA Claim*

Count IV of Plaintiff's Complaint, "Violations Under The DC Human Rights

Law," alleges: "As a direct result of Washington's advocacy, aid and encouragement to

or on behalf of TMA parents and or [sic] students, TMA retaliated against her and

terminated her employment on December 20, 2002 . . . ." Compl. ¶ 72. To prove a

retaliation claim under the D.C. Human Rights Act, Washington must prove that (1) she

was engaged in a statutorily protected activity, encouraged another person to exercise a

right protected by the Act, or opposed a practice made unlawful by the Act; (2) TMA

took an adverse personnel action against her; and (3) a causal connection existed between

the two. D.C. Code § 2-1402.61 (2001); *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir.

1985); *Beckwith v. Career Blazers Learning Ctr. of Wash.*, 946 F. Supp. 1035, 1041-42

(D.D.C. 1996).

The standard for proving a discrimination claim under the DCHRA mirrors Title

VII's tripartite burden-shifting framework. *See Howard Univ. v. Green*, 652 A.2d 41, 44

(D.C. 1994). As such, Washington must first make out a *prima facie* case; TMA can then

produce evidence articulating a legitimate, nondiscriminatory reason for its action; if it

does, Washington must then "produce substantial probative evidence that the proffered

reason was not the true reason for the employment decision and that the real reason was

[discriminatory animus]." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199

F.3d 1365, 1367-68 (D.C. Cir. 2000) (quoting *Chaffin v. John H. Carter Co.*, 179 F.3d

316, 320 (5th Cir. 1999)).

Because in this case TMA has produced credible evidence that Washington

resigned or was terminated solely due to her demand for a higher salary, Washington

must produce substantial probative evidence that this was not the true reason for her

termination for her claim to survive summary judgment.  A review of the record indicates

that Plaintiff clearly has not met this burden.

Contrary to Plaintiff's DCHRA/wrongful discharge "whistleblower" allegations, a

veritable catalog of evidence establishes that Plaintiff resigned or was terminated solely

as a result of her salary disagreement with TMA.  It is uncontested the parties had

substantial disagreements about Washington's salary, job duties, and job performance

during the course of her employment. *See* Compl. ¶ 29, 25; Def.'s Mot. for Summ. J.,

Ex. 2 (2/8/05 Washington Dep.) at 195:16-198:15 & Ex. 9 (9/26/02 E-mail from Joseph

Feldman to Jessica Washington), Ex. 10 (10/7/02 E-mail from Joseph Feldman to Jessica

Washington); Pl.'s Opp'n, Ex. 25 (11/21/02 Mem. from Joseph Feldman to Jessica

Washington Re: Informal Evaluation) (indicating need for improvement on a variety of

specific teaching issues).  Indeed, Washington raised the salary issue multiple times. *See*

Compl. ¶ 29-31.  In one e-mail, for example, she expressed dissatisfaction that "my

salary is lower than several teachers here . . . ." *See* Def.'s Mot. for Summ. J., Ex. 8

(11/18/02 E-mail from Jessica Washington to Joseph Feldman and Joshua Kern).

Washington also testified that at their December 20, 2002 meeting, Kern repeatedly

explained he was asking her to resign because it wasn't "in the best interest of TMA to increase her salary at this time . . . ." Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 250:4-8, 252:5-253:21, 258:6-21, 263:1-20.  The parties' e-mail exchange the following day confirms that Kern asked for Washington's resignation because he "refused to provide the salary increase [she] requested."  *See* Def.'s Mot. for Summ. J., Ex. 11 (12/21/02 E-mail from Jessica Washington to Joshua Kern). Washington's immediate response to her termination alleged no retaliation whatsoever, but instead simply made further demands about her salary, offering her resignation "only if my salary is paid for the duration of the 90 day period." *See id*.  Indeed, prior to the filing of this lawsuit, there is no evidence in the record that Plaintiff ever alleged she was terminated for her assertions that TMA was not in compliance with the IDEA until filing this lawsuit.  *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 290:21-291:7.  Moreover, Washington herself told a future employer that she "was terminated because I asked for a raise."  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 314:14-22.

Washington has done nothing to contradict the clear import of this evidence, other than to assert that TMA's reasons were pretextual.  *See* Compl. ¶ 72.  Plaintiff must, however, produce evidence "beyond her own speculations and allegations" to defeat a motion for summary judgment.  *See Fox v. Giaccia*, 424 F. Supp. 2d 1, 8 (D.D.C. 2006) (quoting *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999)); *see also* Fed. R. Civ. Proc. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading").

Ultimately, Washington has failed to produce any evidence of a causal connection between her advocacy and termination.  No evidence suggests any conflict between TMA and Washington over her alleged "opposition."  Plaintiff identifies only a single specific instance of "opposition" to TMA's disability education practices, and the content of one related conversation.  *See* Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 173:13-22, 152:9-13.  Moreover, it was Plaintiff's job to ensure IDEA compliance.  *See* Def.'s Mot. for Summ. J., Ex. 6 (undated "Expectations of TMA Special Education Coordinator for SY 2002-2003 (draft)" by Joseph Feldman); Ex. 7 (8/2/02 "Special Education Responsibilities and Duties Evaluation Criteria Check List" by Jessica Washington).  TMA expected her to bring any compliance issues to its attention; the school encouraged her to work with ETES to resolve any issues.  *See* Def.'s Mot. for Summ. J., Ex. 9 (9/26/02 E-mail from Joseph Feldman to Jessica Washington); Pl.'s Opp'n, Ex. 23 (11/18/02 Mem. from Joseph Feldman to Jessica Washington Re: Informal Evaluation).  No evidence shows that TMA officials ever expressed dissatisfaction with how she fulfilled these compliance duties.  To the contrary, Mr. Feldman cited how Washington "successfully" "made sure we are in compliance with IDEA" in his comments on Washington's mid-semester informal evaluation.  *See* Pl.'s Opp'n, Ex. 25 (11/21/02 Mem. from Joseph Feldman to Jessica Washington Re: Informal Evaluation).  No evidence suggests TMA had any motive for retaliation.  Washington, for instance, has not lodged her complaints with any outside authority, or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ."  D.C. Code § 2-1402.61 (2001).  As such, it is simply the case that no evidence exists in

the record from which a reasonable fact-finder could infer a causal connection between Washington's advocacy and termination.

Washington also cannot rely on the temporal proximity between her alleged protected behavior and the adverse employment action to rebut TMA's explanation for her termination.  Although Plaintiff could likely rely on the 2-3 month lapse between her complaints and termination to establish her prima facie case of causation, this temporal proximity is not sufficient to rebut TMA's "more plausible explanation for its actions." *See Gleklen*, 199 F.3d at 1368 (affirming dismissal of DCHRA discrimination claim for failure to rebut plausible alternative explanation, though plaintiff had made out prima facie case); *Chandamuri v. Georgetown Uni.*, 274 F. Supp. 2d 71, 84-85 (D.D.C. 2003) (discussing standards for using temporal proximity to prove causation).

The Court therefore concludes that, "there is simply not even a scintilla of evidence to support Washington's claim that TMA terminated her employment in retaliation for her alleged assertion that TMA was not in compliance with the IDEA."[3] Def.'s Mot. for Summ. J. at 11.  To the extent that Defendant's motion seeks summary judgment with respect to Plaintiff's DCHRA/wrongful discharge "whistleblower" claims, Defendant's motion is granted.

E.    *Plaintiff's Intentional Infliction of Emotional Distress Claim*

Plaintiff also alleges in her Complaint that "the conduct engaged in by TMA, its agents and employees constitute [sic] intentional infliction of emotional distress upon

---

[3] In her Complaint Plaintiff also briefly raises the possibility that she was terminated because of her familial status.  *See* Compl. ¶¶ 22, 64.  Plaintiff does not provide evidence to support this claim or pursue it elsewhere in her filings.  In any case, this claim fails for the same reasons her other DCHRA charges fail, as well as the additional reason that TMA officials were aware of her familial status when she was hired.  *See* Pl.'s Opp'n, Ex. 1 (2/8/05 Washington Dep.) at 267:15-21.

plaintiff."  Compl.¶ 50.  However, Plaintiff does not expand upon or pursue this allegation elsewhere in her filings; indeed, her Opposition is entirely silent as to this "claim."

To constitute intentional infliction of emotional distress, an act must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (citation omitted); *see also* Restatement (Second) of Torts § 46 cmt. d (1965).  In the employment context, District of Columbia courts "traditionally have been demanding in the proof required to support an intentional infliction of emotional distress claim."  *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (citing examples); *see also Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 212 ("generally, employer-employee conflicts do not rise to the level of outrageous conduct"); *Elliot v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993) ("Mere discharge of an employee is not 'conduct that goes beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized society'").

Based on the facts presented and lack of evidence produced, the Court concludes that TMA's alleged conduct is insufficient to constitute intentional infliction of emotional distress as a matter of law.  Therefore, to the extent that Plaintiff's Complaint can be read to allege a claim of intentional infliction of emotional distress, Plaintiff's "claim" is dismissed.

F.    *Plaintiff's Sex Discrimination Claim*

Plaintiff alleges for the first time in Plaintiff's Opposition to Defendant's Motion for Summary Judgment that TMA impermissibly discriminated on the basis of sex by

firing Washington and subsequently hiring a male replacement at a higher salary.  *See*

Pl.'s Opp'n, Background ¶¶ 16, 20.  Because Plaintiff failed to timely file for leave to

amend her original Complaint under Fed. R. Civ. P. 15, and because allowing

amendment at this stage of litigation would cause undue prejudice to Defendant,

Plaintiff's newly-raised claims of gender-based discrimination shall not be considered.

Federal Rule of Civil Procedure 15(a) provides that "[a] party may amend the

party's pleading once as a matter of course at any time before a responsive pleading is

served . . . . Otherwise a party may amend the party's pleading only by leave of court or

by written consent of the adverse party; and leave shall be freely given when justice so

requires."  Fed. R. Civ. P. 15(a).  In this case, Plaintiff has neither asked leave of court to

amend, nor has obtained written consent of the adverse party to "add" a gender-based

discrimination claim.  Even if Plaintiff's inclusion of new claims in her Opposition to

Defendant's Motion for Summary Judgment is considered an implicit request to amend,

the request is denied.

Leave to amend a complaint is within the discretion of the District Court, which

should take into account undue delay, bad faith, or undue prejudice to the opposing party.

*See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also*

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31, 91 S.Ct. 795, 28

L.Ed.2d 77 (1971).  Courts within this jurisdiction have frequently denied leave to file an

amended complaint when over three months had passed since the complaint was filed,

discovery was closed, and parties had submitted cross-motions for summary judgment.

*See Atchinson v. Dist. of Columbia*, 73 F.3d 418, 424-27 (D.C. Cir. 1996) (affirming

denial of leave to amend when litigation had been pending for nearly two years,

discovery was completed, and plaintiff made motion on eve of trial); *Anderson v. USAir, Inc.*, 619 F. Supp. 1191, 1198 (D.D.C 1985); *see also Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (denying leave to amend after discovery had been completed and defendant had filed a motion for summary judgment).

In this case, Plaintiff's original Complaint was filed over two years ago.  Plaintiff has had ample time to amend her complaint in response to any new information discovered.  Defendant would be unduly prejudiced if the new claim were allowed to proceed, especially given the fact that discovery has long since closed and was not conducted around this issue.  Leave to amend is denied, and Plaintiff's new-found "sex discrimination" claim is therefore dismissed without prejudice.

### IV: CONCLUSION

For the reasons set forth above, Court shall deny Defendant's Motion for Summary Judgment with respect to Count I's breach of contractual termination procedures claim, and shall grant Defendant's Motion for Summary Judgment with respect to the remainder of Count I, as well as to Counts II, III, and IV in their entirety. An appropriate Order accompanies this Memorandum Opinion.


Date:   June 19, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge