UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JESSICA WASHINGTON,

    Plaintiff,

     v.

THURGOOD MARSHALL ACADEMY,

    Defendant.

Civil Action No. 03-2570 (CKK)

**MEMORANDUM OPINION**
(December 8, 2006)

      Plaintiff Jessica Washington's breach of contract action against her former employer,

Defendant Thurgood Marshall Academy ("TMA"), is presently proceeding to trial. Currently

pending before the Court is Defendant Thurgood Marshall Academy's Motion *in Limine* to

Exclude Evidence and/or Testimony Regarding Defendant's Alleged Violation of the Individuals

with Disabilities in Education Act (hereinafter "TMA's Motion"), which Plaintiff opposes. On

November 1, 2006, this Court concluded that it was unable to properly address TMA's Motion

because Plaintiff's Opposition failed to sufficiently explain either (1) the evidence that Plaintiff

believed exists to demonstrate that her efforts to ensure Defendant's compliance with the IDEA

provided a motivation for her alleged termination; or (2) the manner in which Plaintiff would

seek to use such evidence at trial. As a result, the Court ordered Plaintiff to address these

questions in further briefing on or before December 1, 2006, and held TMA's Motion in

abeyance pending receipt of Plaintiff's additional briefing.

      Plaintiff submitted her Supplemental Response to Opposition to Defendant's Motion *In*

*Limine* (hereinafter "Pl.'s Supp. Resp.") on December 1, 2006. Based upon a searching review

of Plaintiff's Supplemental Response, as well as TMA's Motion *in Limine*, Plaintiff's

Opposition, Defendant's Reply to Plaintiff's Opposition, the relevant case law, and the entire

record herein, the Court finds that the evidence Plaintiff would seek to introduce is of minimal, if

any, probative value, which is greatly outweighed by the prejudicial potential of that evidence.

As a result, the Court shall grant TMA's Motion *in Limine* and shall preclude Plaintiff from

introducing at trial evidence of TMA's alleged non-compliance in an attempt to argue that such

alleged non-compliance led TMA to ask for Plaintiff's resignation.   However, as discussed

below, Plaintiff shall be allowed to introduce evidence of her efforts relating to TMA's IDEA

compliance, insofar as such evidence is necessary to provide the factual background to Plaintiff's

breach of contract claim.

## DISCUSSION

A.      *Background Relevant to TMA's Motion in Limine*

The Court shall assume familiarity with the Court's June 19, 2006 Memorandum Opinion

granting-in-part and denying-in-part TMA's Motion for Summary Judgment, *Washington v.*

*Thurgood Marshall Academy*, Civ. A. No. 03-2570, 2006 WL 1722332, *1 (D.D.C. Jun. 19,

2006), which includes an extensive discussion of the facts underlying this action, as well as the

Court's November 1, 2006 Memorandum Opinion, *Washington v. Thurgood Marshall Academy*,

Civ. A. No. 03-2570, slip op. at 6 (D.D.C. Nov. 1, 2006) (hereinafter "Slip Op."), from which

much of this background is quoted verbatim.   Plaintiff Jessica Washington, a special education

teacher, brought this action against her former employer, Thurgood Marshall Academy ("TMA"),

alleging that TMA misrepresented Plaintiff's job duties and working hours to induce her to sign a

one-year employment contract, then fired her for bringing school violations of the Individuals

with Disabilities in Education Act ("IDEA") to TMA's attention, in violation of contract provisions, District of Columbia tort law regarding wrongful discharge, and the D.C. Human Rights Act. *Washington*, 2006 WL 1722332 at *1.

Following extensive discovery, TMA filed a Motion for Summary Judgment, Plaintiff filed an Opposition to TMA's Motion for Summary Judgment, and TMA filed a Reply. *Id.* In its June 19, 2006 Memorandum Opinion, the Court granted TMA's Motion for Summary Judgment as to Plaintiff's Misrepresentation (Count II), Wrongful Discharge (Count III), and D.C. Human Rights Act (Count IV) counts.[1] As to Plaintiff's Breach of Contract claim (Count I), the Court granted TMA's Motion for Summary Judgment with respect to Plaintiff's allegations that Defendant unilaterally modified her job duties, but denied TMA's Motion for Summary Judgment insofar as Plaintiff alleged that TMA Director Joshua Kern severed Plaintiff's employment with TMA without cause, violating the agreed-upon term of employment and procedures for termination provided for in her August 1, 2002 Employment Contract. *Id.* at *7. Thus, after summary judgment, Plaintiff was left with "one remaining triable claim: her contention within Count I that she did not resign employment at TMA, but rather was involuntarily terminated without cause in violation of Paragraph Eight of her employment

---

[1] In her Opposition to TMA's Motion *in Limine*, Plaintiff asserts that "[c]ontrary to TMA's motion this court did not conclude or decide on the merits [Plaintiff's] "Misrepresentation", Wrongful Discharge or Violations under the DCHRA." Pl.'s Opp'n. at 2. Plaintiff is incorrect. However, as previously noted, the Court's June 19, 2006 Memorandum Opinion conclusively disposed of Plaintiff's Misrepresentation, Wrongful Discharge, and D.C. Human Rights Act claims, *Washington*, 2006 WL 1722332 at *1, and Plaintiff has no legal basis for suggesting otherwise.

contract." *Id.* at *1.[2]

TMA's Motion *in Limine* arises out of the Court's grant of summary judgment with respect to Plaintiff's claim under the D.C. Human Rights Act (Count IV). Specifically, TMA asserts that, in granting TMA summary judgment with respect to that claim, "the court found, as a matter of law, that plaintiff was not terminated because of her purported complaints regarding TMA's noncompliance with the IDEA." TMA's Mot. at 3. Indeed, as TMA notes, the Court's June 19, 2006 Memorandum Opinion concluded "that there is simply not even a scintilla of evidence to support [Plaintiff's] claim that TMA terminated her employment in retaliation for her alleged assertion that TMA was not in compliance with the IDEA." *Washington*, 2006 WL 1722332 at *17; Def.'s Reply to Pl.'s Opp'n. at 3 n.3 (hereinafter "Def.'s Reply"). For her part,

---

[2] The Court will clarify a matter that may have engendered some confusion as to the precise factual question remaining for trial in this case. The Court's June 19, 2006 Memorandum Opinion left Plaintiff with a triable claim "that she did not resign employment at TMA, but rather was involuntarily terminated without cause in violation of Paragraph Eight of her employment contract." *Washington*, 2006 WL 1722332 at *1. However, in so doing, the Court referred to Plaintiff's "termination" in the manner in which it has loosely been used in this case, i.e., to mean that Plaintiff's employment relationship with TMA was severed, and not in the legal manner in which that term is used in the context of Plaintiff's employment contract. To be clear, Plaintiff's employment contract specifies two ways in which Plaintiff's employment relationship with TMA could be severed: (1) Plaintiff could voluntarily resign, in which case she was required to give TMA 90 days notice, or (2) TMA could terminate Plaintiff involuntarily for cause. *Id.* at *8 (citing Compl., Ex. 1 (8/1/02 Employment Agreement) ¶¶ 8(a)-(b)). Neither Plaintiff nor TMA has ever claimed that TMA "terminated" Plaintiff as that term is defined in her employment contract. Neither party has ever asserted that TMA told Plaintiff it was firing, terminating, or discharging her, nor has TMA ever suggested that it had cause to terminate Plaintiff's employment. *See id.* at 9 n.2. Moreover, the Court's June 19, 2006 Memorandum Opinion granted TMA summary judgment as to Plaintiff's "Wrongful Discharge" claim. As discussed in greater detail below, the sole factual issue remaining for trial in this case is whether, as TMA asserts, Plaintiff voluntarily resigned her employment on December 20, 2002 at Starbucks, or whether Plaintiff instead offered TMA her resignation via e-mail the next morning conditioned on her receipt of 90 days' salary, and if the latter is the case, whether TMA was entitled to sever Plaintiff's employment relationship without paying her the 90 days' salary.

Plaintiff asserts that TMA's Motion "directly interferes with [Plaintiff's] ability to obtain due process in the prosecution and presentation of her breach of contract claim," and that granting TMA's Motion would "be tantamount to a full dismissal of [Plaintiff's] Breach of Contract Claim." Pl.'s Opp'n. and Mem. in Opp'n. to Def.'s Mot. in Limine (hereinafter "Pl.'s Opp'n.") at 1-2. Plaintiff further asserts that a "motion for summary judgment is not a substitute for a trial" and does not "adjudicate on the merits a claim." *Id.* at 2. Finally, Plaintiff argues that "evidence concerning her allegations against [sic] TMA's noncompliance with the IDEA, her complaints of its noncompliance . . . are deeply rooted and intertwined in her breach of contract claim" and thus that "IDEA evidence is key to deciding whether TMA had any motive or intent to discharge [Plaintiff]." *Id.* at 6.

The Court preliminarily considered TMA's Motion in its November 1, 2006 Memorandum Opinion; nevertheless, in the interest of conclusively resolving TMA's Motion, the Court shall reiterate a number of issues discussed in that Opinion. As an initial matter, it should be noted that the Court's June 19, 2006 Memorandum Opinion regarding TMA's Motion for Summary Judgment only addressed Plaintiff's allegations of TMA's non-compliance with the IDEA, her efforts to ensure compliance, and the link between those actions and her alleged termination by TMA in the context of Plaintiff's claim under the D.C. Human Rights Act, and did not consider those allegations in the context of Plaintiff's breach of contract claim. In contrast, Plaintiff's Opposition to TMA's Motion *in Limine* asserts that evidence regarding TMA's alleged non-compliance with the IDEA and Plaintiff's activities in that respect is "key to deciding whether TMA had any motive or intent to discharge [her]." Pl.'s Opp'n. at 6. Thus, the pertinent consideration is whether Plaintiff's purported evidence of TMA's alleged non-

compliance is relevant to her breach of contract claim – a consideration which the Court notes is

governed by a different legal framework than that which Plaintiff faced at summary judgment.

     B.    *Evidence Before the Court At the Time of Its November 1, 2006 Memorandum*
           *Opinion*

     At the time of the Court's November 1, 2006 Memorandum Opinion, the following

evidence was already before the Court:

     Plaintiff was hired by, and began teaching at, TMA in August 2002.  *Washington*, 2006

WL 1722332 at * 2-4.  It is undisputed that one aspect of Plaintiff's job was ensuring TMA's

compliance with the IDEA and performing IDEA-related functions.  *Washington*, 2006 WL

1722332 at *16 (citing Def.'s Mot. for Summ. J., Ex. 6 (undated "Expectations of TMA Special

Education Coordinator for SY 2002-2003 (draft) by J. Feldman); Ex. 7 (8/2/02 "Special

Education Responsibilities and Duties Evaluation Criteria Checklist" by J. Washington).  After

beginning her employment with TMA, Plaintiff identified a number of special education students

with records who had not been receiving special education.  *Id* at *4.

     Plaintiff then met with TMA officials during the fall of 2002 and "discussed with TMA

that it was not complying with the requirements under IDEA."  *Id.* (citing Compl. ¶ 25; Def.'s

Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 172:9-173:3).  Specifically, on November

1, 2002, Plaintiff had a discussion with TMA Executive Joshua Kern about IDEA compliance, in

which she informed him that the students were suffering, that the school was not in compliance,

and that she had identified several additional students in need of special education.  *Id.*  Also at

this meeting, Plaintiff raised, for the first time, the issue of the alleged inadequacy of her salary,

*id.* (citing Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 189:3-17), and informed

TMA "that she had been contacted by another school about a possible position and to let her know whether or not TMA would increase her salary," *id.* On November 22, 2002, Plaintiff again met with Kern, who advised Plaintiff that he needed more time to look into the issues they had discussed at their previous meeting. *Id.* at *5 (citing Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 210:20-211:12).

Also during November 2002, Plaintiff received two memoranda from TMA Principal Joseph Feldman regarding her informal evaluation of November 5, 2002. *See* Pl.'s Opp'n., Ex. 23 (11/18/02 Memorandum from J. Feldman to J. Washington re: Informal Evaluation); Ex. 25 (11/21/02 Memorandum from J. Feldman to J. Washington re: Informal Evaluation). Each memorandum noted a number of areas in which Plaintiff's job performance could be improved, but also noted areas in which Plaintiff was succeeding at her job, which specifically included IDEA-related activities. *Id.* In addition, each memorandum expressed Feldman's hope that the evaluation process would allow Plaintiff to be successful in her job by the end of the school's semester. *Id.* According to Plaintiff, she "just continued" doing her job for several weeks, until December 20, 2002, when she again asked Kern whether he "had come up with anything" regarding the issues they had previously discussed. *Id.* (citing Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 244:19-247:11. In response, Kern asked Plaintiff to meet him at a Starbucks at 7:00 p.m. that evening. *Id.* (citing Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 244:19-248:5; Compl. ¶ 31).

The parties disagree as to the events that unfolded at the Starbucks on December 20, 2002, although they agree that during the course of the conversation Kern asked Plaintiff to resign her position at TMA. *Id.*; Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at

249:20-250:1; Def.'s Mot. for Summ. J, Ex. 13 (2/18/05 Kern Dep.) at 108:4-21.  TMA

maintains that Plaintiff accepted Kern's suggestion that she voluntarily resign, while Plaintiff

maintains that she did not voluntarily resign on that night.  Notably, Plaintiff's deposition

testimony regarding the December 20, 2002 meeting does not indicate that Plaintiff and Kern

ever discussed whether TMA approved of Plaintiff's IDEA-related activities.  Def.'s Mot. for

Summ. J., Ex. 2 (2/8/05 Washington Dep. at 248-257).  Instead, Plaintiff testified that their

conversation focused on Kern's denial of Plaintiff's request for a salary increase.  *Id.*

The morning after the December 20, 2002 meeting at Starbucks, Plaintiff sent Kern a

short follow-up e-mail, in which she stated that Kern's "reason for asking for my resignation was

stated as due to [his] refusal to provide the salary increase I requested."  Def.'s Mot. for Summ.

J., Ex. 11 (12/21/02 e-mail from J. Washington to J. Kern).  Plaintiff further wrote that she was

"offering my 90 day resignation as stipulated in our employment contract only if my salary is

paid for the duration of the 90 day period."  *Id.*  Kern responded to Plaintiff's e-mail by writing

that he had "asked for [her] resignation effective immediately based on two previous

conversations we had over the last month in which you presented me an ultimatum of paying

more and / or reducing your responsibilities or you would accept another position that you were

being offered."  Def.'s Mot. for Summ. J., Ex. 12 (12/21/02 e-mail from J. Kern to J.

Washington).  Kern expressed his belief that Plaintiff had "agreed to resign effective

immediately" the previous night, but noted that Plaintiff had that morning "expressed an interest

in not resigning effective immediately, and so you gave 90 day notice per the terms of your

contract."  *Id.*  Kern explained to Plaintiff his belief that the 90 day notice in Plaintiff's

employment contract was for "TMA's protection" and did "not obligate TMA to pay you through

90 days;" Kern also made clear to Plaintiff that, in either case, he considered her employment

relationship with TMA to be severed. *Id.* Again, neither of these e-mails indicate that TMA's

decision to ask for Plaintiff's resignation was directly related to her efforts to ensure TMA's

IDEA compliance. The lack of evidence connecting Plaintiff's IDEA-related activities to the

severing of her employment relationship with TMA is further compounded by Plaintiff's

deposition testimony that prior to filing her Complaint – almost a year after the December 20,

2002 meeting at Starbucks – Plaintiff never told Kern that she believed she was asked to resign

in retaliation for asserting that TMA was not in compliance with the IDEA. Def.'s Mot. for

Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 290:18-291:7.

Although TMA maintains that TMA was never out of compliance with the IDEA, Slip

Op. at 5 (citing Def.'s Reply at 4), the evidence in the record at the time of the Court's November

1, 2006 Memorandum Opinion clearly demonstrated that Plaintiff was involved with evaluating

TMA's compliance with the IDEA, that Plaintiff considered TMA to be out of compliance with

the IDEA during the fall of 2002, and that she brought her concerns regarding TMA's non-

compliance to TMA's attention," *id.* (citing *Washington*, 2006 WL 1722332 at *4).

Nevertheless, the Court's November 1, 2006 Memorandum Opinion determined that Plaintiff had

"presented no evidence whatsoever that TMA viewed her efforts to ensure TMA's compliance

with the IDEA in a negative light, that anyone associated with TMA criticized Plaintiff for her

work concerning IDEA compliance, or that TMA ever discouraged Plaintiff from raising

concerns about IDEA compliance or disagreed with Plaintiff's assessment as to TMA's alleged

non-compliance." *Id.* As Plaintiff had therefore failed to "demonstrate any link between TMA's

alleged non-compliance during the fall of 2002 and Plaintiff's efforts to ensure TMA's

compliance with the IDEA, on the one hand, and Plaintiff's alleged termination by TMA in December 2002, on the other," *id.* at 6, the Court ordered Plaintiff to submit additional briefing identifying "the evidence that Plaintiff believes exists to demonstrate that her efforts to ensure Defendant's compliance with the IDEA provided a motivation for her alleged termination." *Id.* at 7. This additional briefing was intended to allow Plaintiff the opportunity to specify her previously unidentified evidence of a link between Plaintiff's activities regarding TMA's alleged non-compliance with the IDEA and the severing of Plaintiff's employment relationship with TMA.

C.   *Evidence Introduced in Plaintiff's Supplemental Response*

Much of Plaintiff's Supplemental Response serves to provide the Court with additional detail as to the nature of TMA's alleged non-compliance. Specifically, Plaintiff includes large verbatim portions of the transcript of her deposition, in which she testified that during the Fall of 2002, rather than evaluate students with behavioral problems to determine if they had disabilities, TMA "habitually removed the students without identifying them under the guise of having the parents to [sic] withdraw them after they didn't abide by a so-called behavior contract that they knew the students weren't going to live up to." Pl.'s Supp. Resp. at 6 (2/21/05 Washington Dep. at 155:14-19). Plaintiff testified that this policy failed to comply with the IDEA. *Id.* at 7-11 (2/21/05 Washington Dep. at 156-66). Plaintiff further testified that the behavioral contracts were signed at meetings involving TMA officials, students with behavioral issues, and their parents, *id.* at 8 (2/21/05 Washington Dep. at 158:1-21), and that Tanya Featherston, TMA's dean of students, who was present at such a meeting, "admitted herself that, you know, this was a ploy, this whole process was a ploy to make Thurgood Marshall look good to the board of

10

directors and to the D.C. Public Charter Boards, because it removed them from having expulsions on their record." *Id.* at 12 (2/21/05 Washington Dep. at 168:4-19). Featherston's comments constitute an admission that TMA was using behavior contracts, which if Plaintiff is correct that such a policy violated the IDEA, might indicate IDEA non-compliance on the part of TMA.

Plaintiff's Supplemental Response also includes the only evidence Plaintiff has yet identified to suggest that TMA viewed Plaintiff's activities relating to IDEA compliance in a negative light. Plaintiff claims that at the beginning of the school year she participated in the meetings with parents and students where behavioral contracts were drawn up, *id.* at 8 (2/21/05 Washington Dep. at 158:1-21), but that during late September through October 2002, TMA Principal Feldman and other TMA officials began excluding Plaintiff from such meetings, which Plaintiff states that she was "required to be present in." *Id.* at 17. In her deposition testimony, Plaintiff speculated that she was excluded "because [Feldman] knew that I would advocate for that child, because that child should not have been removed from Thurgood Marshall . . . and make the parent aware of her rights under IDEA." *Id.* at 11 (2/21/05 Washington Dep. at 166:10-167:9), 17. However, neither Plaintiff's deposition testimony nor her Supplemental Response indicates that anyone ever told Plaintiff why she was actually excluded from the meetings.

Plaintiff devotes the remainder of her Supplemental Response to broadly identifying three categories of witnesses that she "believes . . . exist and would provide the testimony and [sic] to support her claims." Pl.'s Supp. Resp. at 3. These purported witnesses include "Parents of students who required IDEA services or were suspected of needing IDEA services," *id.* at 16-17; "Employees that Worked at TMA in 2002," *id.* at 17-18; and "Former students that Attended

TMA and required or were suspected of needed [sic] special services pursuant to IDEA," *id.* at

18-19.  Plaintiff repeatedly states that she "believes" such witnesses exist and that their testimony

would corroborate Plaintiff's own testimony regarding her efforts to ensure TMA's compliance

with the IDEA and TMA's exclusion of Plaintiff from meetings with parents during the fall of

2002.  Most specifically, Plaintiff states that "former TMA employees it is believed will testify

that TMA officials had decided to terminate [Plaintiff] in October 2002 in order to 'save the

school' and/or 'avoid controversy' directly because of her advocacy, complaints and efforts to get

TMA to provide services . . . under the IDEA."  *Id.* at 18.

        If Plaintiff had named any of her purported witnesses, indicated what their actual

testimony would be, or what their basis of knowledge for their testimony would be, Plaintiff

might be able to rely on these purported witnesses to provide evidence of a link between her

IDEA-related activities and the severing of her employment relationship.  However, Plaintiff has

failed to provide any specific information regarding these purported witnesses and, despite the

fact that the Court's November 1, 2006 Order required Plaintiff to present such information,

offers only her "belief" that such witnesses exist and could corroborate her testimony.  As such, it

is unclear that Plaintiff has, in fact, even spoken with her purported witnesses or determined what

testimony they could provide.  At this late stage of the proceedings, with discovery closed and

this case poised for trial in the near future, Plaintiff's failure to provide specific information

regarding her purported witnesses leaves the Court unable to credit her representations that such

witnesses exist or that a link existed between her claim that TMA was not in compliance with the

IDEA and TMA's decision to ask for Plaintiff's resignation.[3]

In considering the substance of Plaintiff's evidence, the Court shall assume that TMA had issues regarding IDEA compliance during the fall of 2002 (i.e., the behavioral contracts described above), and that Plaintiff was engaged in efforts to bring TMA into compliance. The Court notes that its November 1, 2006 Memorandum Opinion alerted Plaintiff to the paucity of evidence that "TMA viewed her efforts to ensure TMA's compliance with the IDEA in a negative light." Slip. Op. at 5. Nevertheless, the only evidence Plaintiff has proffered of such a negative reaction is her deposition testimony that she participated in meetings with parents and students at the beginning of the school year, but was subsequently excluded from such meetings. Pl.'s Supp. Resp. at 8 (2/21/05 Washington Dep. at 158:1-21). As discussed above, Plaintiff speculates that she was excluded from these meetings because she alerted parents that TMA was not complying with the IDEA, but does not provide evidence to support this rationale. It is, of course, possible that Plaintiff was excluded from these meetings for other, completely innocuous, reasons.

Moreover, this sole piece of potential evidence that TMA negatively viewed Plaintiff's efforts to bring TMA into compliance with the IDEA is significantly undercut by other evidence presently before the Court. Specifically, Plaintiff claims that she was excluded from meetings with parents in late September through October 2002, Pl.'s Supp. Resp. at 17; however, after that

---

[3] In addition, the Court notes that significant prejudice would enure to TMA if Plaintiff were allowed to rely on her "belief" that unnamed witnesses exist who would offer unspecified testimony, as TMA would be entirely unable to prepare to cross-examine such witnesses or prepare their own witnesses to rebut this alleged evidence. The parties' joint pretrial statement, which includes a list of witnesses and the expected scope of their testimony, is due December 15, 2006.

exclusion, during November 2002, Plaintiff received two informal written evaluations from

TMA Principal Feldman, both of which described the IDEA-related aspects of Plaintiff's

performance in a positive manner.  On November 18, 2002, Plaintiff received a less-than-

encouraging memorandum from Feldman summarizing a conversation regarding Plaintiff's

informal evaluation of November 5, 2002.  *Washington*, 2006 WL 1722332 at *5 (citing Pl.'s

Opp'n., Ex. 23 (11/18/02 Mem. from J. Feldman to J. Washington re: Informal Evaluation).  The

memorandum states "if this were the semester you would not receive any bonus," Pl.'s Opp'n.,

Ex. 23 at 1, and lists a number of "Areas in Need of Improvement," *id.*  However, the November

18, 2002 memorandum also states, "[i]t is my hope that this conversation and memo will clarify

my expectations and that you can be successful by the time of the semester's formal evaluation,"

*id.*, and lists three "Positive Performance Areas," all of which relate to Plaintiff's implementation

of special education programs.

 Even more significantly, Plaintiff received a second memorandum from Feldman on

November 21, 2002, which Feldman notes is a "more detailed version of the summary of our

conversation regarding your informal evaluation" and reminds Plaintiff that the "process is to

enable you to have a clear idea of my expectations so you can be successful by the time of the

semester's formal evaluation."  Pl.'s Opp'n., Ex. 25 (11/21/02 Mem. from J. Feldman to J.

Washington re: Informal Evaluation) at 1.  The November 21, 2006 Memorandum lists a number

of "Tasks which you have completed or are completing successfully" as well as "Responsibilities

in which you have had some successes but still need to improve."  *Id.*  The first task that Feldman

notes Plaintiff has completed or is completing successfully is "Be knowledgeable of, and comply

with, relevant state and local regulations governing special education . . . . You have

demonstrated that you have an understanding of special education regulations, and in most cases, you have made sure that we are in compliance with IDEA." *Id.* Other areas of noted success include IDEA-related activities such as developing procedures and ensuring due process. *Id.* In contrast to Plaintiff's assertions that TMA was unhappy with Plaintiff's activities related to IDEA compliance, these memoranda indicate that, as of the end of November 2002, and more than a month after Plaintiff was excluded from meetings with parents and students, TMA was satisfied with Plaintiff's activities regarding IDEA compliance and hopeful that Plaintiff would succeed in her employment with TMA.

> D.    *Relevance of Plaintiff's Allegations that TMA Failed to Comply with the IDEA and Rule 403 Balancing*

It is the basic tenet of the Federal Rules of Evidence that to be admissible, evidence must be relevant. Fed. R. Evid. 402. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. However, not all relevant evidence is admissible. Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

In attempting to assess the relevance of Plaintiff's allegations of TMA's non-compliance with the IDEA to her breach of contract claim, it is important to isolate the factual dispute underlying Plaintiff's breach of contract claim. As noted above, Plaintiff's employment agreement contains two means by which Plaintiff's employment relationship with TMA could be

severed: (1) Plaintiff could voluntarily resign, in which case she was required to give TMA 90

days notice, or (2) TMA could terminate Plaintiff involuntarily for cause.  *Id.* at *8 (citing

Compl., Ex. 1 (8/1/02 Employment Agreement) ¶¶ 8(a)-(b)).  There has been no suggestion by

either party that TMA "terminated" Plaintiff, as that term is defined in her employment

agreement, as neither party suggests that TMA ever told Plaintiff that it was firing her,

terminating her, discharging her, or used any similar phrase, nor does TMA claim that it had

cause to terminate Plaintiff.  Moreover, the Court's June 19, 2006 Memorandum Opinion

conclusively disposed of Plaintiff's "Wrongful Discharge" claim.  *Washington*, 2006 WL

1722332 at *14.  Instead, the parties agree that Kern asked for Plaintiff's resignation at Starbucks

on December 20, 2002.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 249:20-

250:1; Def.'s Mot. for Summ. J, Ex. 13 (2/18/05 Kern Dep.) at 108:4-21.  The sole factual

dispute remaining for trial is whether, as Plaintiff asserts, she did not voluntarily resign on

December 20, 2002, but rather offered her resignation the next day via e-mail conditioned on

TMA's promise to pay her for an additional 90 days, or whether, as TMA asserts, Plaintiff

affirmatively agreed to resign effective immediately on December 20, 2002, and the next day

offered notice of her resignation coupled with a demand for pay under an erroneous interpretation

of her employment contract.  *Washington*, 2006 WL 1722332 at *9.

     Once the factual dispute at issue in this case is precisely defined, it is obvious to the Court

that the evidence Plaintiff would seek to introduce of TMA's alleged non-compliance is of

marginal, if any, probative value in connection with her breach of contract claim.  It should be

noted that, as TMA correctly points out, the Court's June 19, 2006 Memorandum Opinion

already determined "that there is simply not even a scintilla of evidence to support [Plaintiff's]

claim that TMA terminated her employment in retaliation for her alleged assertion that TMA was not in compliance with the IDEA," *Washington*, 2006 WL 1722332 at *17; Def.'s Reply at 3 n.3, and that Plaintiff had no evidence to support her claim of Wrongful Discharge, *Washington*, 2006 WL 1722332 at *14.  Moreover, the Court's review of the entire factual record reveals that Plaintiff has no direct evidence that TMA was motivated to ask for her resignation because she claimed that TMA was not in compliance with the IDEA, particularly because ensuring IDEA compliance was part of Plaintiff's job.  At best, Plaintiff would ask the jury to weigh (1) the fact that she was engaged in efforts to ensure TMA's IDEA compliance, and (2) the fact that for an unknown reason she was excluded from meetings which she claims she was required to attend, against (3) the documentary evidence that TMA was satisfied with her IDEA-related activities, and conclude that Plaintiff's claims of IDEA non-compliance motivated TMA to ask for her resignation.  The conclusion that Plaintiff would have the jury reach is, therefore, highly speculative.  Moreover, in light of the fact that TMA did not unilaterally terminate Plaintiff, but rather asked for her resignation, the actual motivation that led TMA to ask for Plaintiff's resignation is of extremely limited probative value in connection with Plaintiff's breach of contract claim.

Furthermore, TMA argues that Plaintiff's evidence of TMA's alleged non-compliance should be excluded pursuant to Federal Rule of Evidence 403, *see* TMA Mot. at 5; TMA Reply at 3-4, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  After considering the significant potential prejudice

17

attendant to Plaintiff's evidence, the Court agrees with TMA that evidence regarding TMA's

alleged non-compliance, *per se*, should be excluded under Federal Rule of Evidence 403.

In the Court's opinion, the key prejudice inherent in allowing Plaintiff to introduce

evidence of TMA's alleged non-compliance with the IDEA relates to the Court's grant of

summary judgment with respect to Plaintiff's claim under the D.C. Human Rights Act (Count

IV) and her claim for Wrongful Discharge (Count III).  *See* Def.'s Mot. *in Limine* at 5; Def.'s

Reply at 3-4.  The Court has already conclusively determined, albeit in a different context, that

TMA did not retaliate against Plaintiff for allegedly bringing to TMA's attention their non-

compliance with the IDEA and that she has no claim for wrongful discharge.  *Washington*, 2006

WL 1722332 at *17; Def.'s Reply at 3 n.3.  In opposing TMA's Motion *in Limine*, Plaintiff has

made clear that she would seek to convince the jury that (1) TMA was out of compliance with

the IDEA during the fall of 2002; (2) Plaintiff brought this non-compliance to the attention of

TMA as well as parents; (3) TMA was unhappy with Plaintiff's efforts regarding IDEA

compliance or was afraid that Plaintiff's actions would damage its reputation; and (4) TMA

sought to sever Plaintiff's employment relationship with TMA as a result.  The Court has never

addressed the issue of whether or not TMA was in compliance with the IDEA during the fall of

2002.  TMA maintains that it was not out of compliance with the IDEA during the fall of 2002,

Def.'s Reply at 4, and would surely seek to defend against Plaintiff's allegations of non-

compliance.  As such, it is clear that forcing TMA to litigate the issue of IDEA compliance for

the first time as well as to relitigate issues already decided by the Court, in order to defend

against Plaintiff's allegations of non-compliance, would be unduly prejudicial to TMA,

particularly in light of the highly speculative nature of Plaintiff's evidence.

Furthermore, it is obvious that allowing Plaintiff to introduce her allegations regarding TMA's non-compliance would engender significant jury confusion.  As outlined above, the factual issue the jury will be asked to consider in connection with Plaintiff's breach of contract claim is whether Plaintiff voluntarily resigned her employment, or whether she offered a conditional resignation that required TMA to pay her the 90 days' salary she requested. Allowing Plaintiff to argue, as she seeks to do, that TMA sought to sever its employment relationship with her because she claimed that TMA was not in compliance with the IDEA would require an entirely collateral side trial.  Plaintiff's evidence would lead to the introduction of testimony regarding: (1) the requirements of the IDEA; (2) TMA's policies and practices during the fall of 2002; (3) whether those policies and practices complied with the IDEA; (4) Plaintiff's activities regarding TMA's alleged non-compliance; and (5) whether TMA was dissatisfied with Plaintiff's activities relating to IDEA compliance, none of which are even remotely relevant to the limited factual issue underlying Plaintiff's breach of contract claim.

Therefore, the Court concludes that the evidence Plaintiff would seek to introduce regarding TMA's alleged non-compliance is of minimal, if any, probative value.  The Court further concludes that the risk is high that the introduction of this evidence will engender undue prejudice to TMA, as well as significant confusion for the jury as to the issues and single claim they need to determine.  As such, the Court shall preclude Plaintiff from introducing at trial direct or other evidence that TMA was not in compliance with the IDEA during the fall of 2002, or that TMA's alleged non-compliance motivated TMA to seek Plaintiff's resignation, as the focus of such evidence would be whether or not TMA was in fact in compliance with the IDEA.

E.      *Evidence Relevant to Plaintiff's Breach of Contract Claim*

In excluding the evidence discussed above, the Court notes that Plaintiff is not entirely precluded from raising at trial her activities relating to TMA's IDEA compliance, insofar as those activities form part of the factual background of Plaintiff's breach of contract claim and the relationship between the parties.  Specifically, Plaintiff alleges that on November 1, 2002, she met with TMA Executive Joshua Kern and informed Kern that TMA was not in compliance with the IDEA.  Def.'s Mot. for Summ. J., Ex. 2 (2/8/05 Washington Dep.) at 173:4-174:20.  It appears that Plaintiff raised these concerns in the context of an overall discussion of her responsibilities at TMA, and expressed her belief that she was entitled to an increase in salary in light of the amount of work – including IDEA-related work – she was doing.  *Id.* at 196:7-201:19.  Plaintiff raised these issues again during her November 22, 2002 meeting with Kern.  *Id.* at 210:20-211:19.

Plaintiff's meetings with Kern during November 2002 and the matters discussed during those meetings provide evidence of the relationship between Plaintiff and TMA during the fall of 2002 as well as the events that led up to the December 20, 2002 meeting at Starbucks.  As such, Plaintiff will be allowed to introduce at trial evidence of these meetings including the discussions of Plaintiff's IDEA-related responsibilities and her view that TMA had some IDEA compliance issues that she was addressing.  The introduction of this evidence will be for the limited purpose of providing the jury with the factual background for Plaintiff's breach of contract claim.  The introduction of such evidence will not, however, require the jury to reach the collateral factual question of whether or not TMA was *in fact* in compliance with the IDEA during the fall of 2002.

**CONCLUSION**

For the foregoing reasons, the Court shall grant TMA's Motion *in Limine*. At trial, Plaintiff shall be precluded from presenting testimony, documents, or other direct or demonstrative evidence regarding TMA's alleged non-compliance with the IDEA in an effort to argue that such alleged non-compliance provided a motivation for TMA's decision to ask for Plaintiff's resignation. Plaintiff shall, however, be permitted to introduce evidence of her efforts relating to TMA's IDEA compliance or lack thereof, insofar as such evidence is necessary to provide the factual background for Plaintiff's breach of contract claim. The parties are further instructed to note the Court's framing of this issue in preparing their JOINT Pretrial Statement, which is due on or before December 15, 2006.


Date:   December 8, 2006



_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge